Filed 6/30/21  In re E.J. CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re E. J., a Person Coming Under the Juvenile Court Law. | |
| SAN FRANCISCO HUMAN SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>E. P.,<br><br>        Defendant and Appellant. | A161744<br><br>(City & County of San Francisco Super. Ct. No. JD18-3109) |

E. P. (Mother) appeals orders of the juvenile court terminating her parental rights to her daughter, E. J. (Minor) and denying her request for a continuance.  She contends that lack of visitation deprived her of her due process right to establish the beneficial relationship exception to termination of parental rights and that the juvenile court abused its discretion in denying a continuance to allow further visitation.  We shall affirm the orders.

**FACTUAL AND PROCEDURAL BACKGROUND**

We are familiar with the background of this dependency proceeding through our review of Mother's petition for extraordinary relief from the order setting a hearing for a permanent plan (*E. J. v. Superior Court* (Oct. 22,

1

2019, A157965) [nonpub. opn.] (*E.J. I*); Welf. & Inst. Code, § 366.26; Cal. Rules of Court, rule 8.452)[1] and her appeal of an order allowing Minor's foster parents to move with Minor to another state (*In re E. J.* (Feb. 9, 2021, A160508) [nonpub. opn.] (*E.J. II*)). We quote from our opinion in *E.J. I* at length:[2]

## I.    Jurisdiction

"The San Francisco Human Services Agency (the Agency) filed a petition pursuant to section 300 on behalf of [Minor], then four years old, on April 30, 2018. The petition alleged Mother had physically and verbally assaulted people in Minor's presence, that her ability to care for Minor was impaired by anger management and mental health issues, that she inserted her finger into Minor's vagina on public transportation to check for signs of sexual abuse, and that she left Minor with no provision for support after she was arrested.

"According to the detention report, Mother physically attacked the property manager of her housing complex in Minor's presence. Minor was 'in the middle' of the altercation and was 'screaming and yelling and telling [Mother] to stop.' There were reports that Mother had assaulted multiple other people at the housing complex in the past in Minor's presence, and she was facing eviction. There were also reports that Mother had a history of accusing people of sexually abusing Minor, which led to Minor being interviewed and examined for unfounded sexual abuse allegations. The previous year, the Agency had received two reports that Mother inserted her

---

[1] All undesignated statutory references are to the Welfare and Institutions Code.

[2] Empty brackets [ ] indicate deletions from our earlier opinion; brackets with material enclosed indicate matter added by this court.

2

finger into Minor's vagina on public transportation to check for signs of sexual abuse after Minor had been at daycare. Mother had been arrested for violating a protective order, and the person with whom she had left Minor was unable to provide long-term care for her. Minor was detained and supervised visitation was ordered for Mother on May 1, 2018.

"The Agency made an application to suspend visitation between Minor and Mother on June 11, 2018. A social worker provided a declaration stating that Mother had accused Minor's foster parent of 'touching' Minor, that Mother became 'dysregulated' and called 911 when Minor arrived at a visit, and that she disrupted the visit. At a meeting to discuss the Agency's concerns about her behavior, Mother violently bumped into a psychologist, screamed obscenities, cried, and slammed her fist on the table. Mother later threatened to have the social worker followed and threatened to ' "smack" ' him and shoot him. On June 12, 2018, the court issued a temporary restraining order protecting the social worker and suspended visits pending a medication and psychological evaluation; it later issued a restraining order. [¶]

"On June 18, 2018, the juvenile court found true allegations that Mother had anger management issues and Minor had witnessed verbal and physical altercations and had tried to intervene; that Mother had mental health issues that required assessment and treatment; and that Minor was at risk because Mother had a history of making unsubstantiated allegations of sexual abuse. It declared Minor a dependent and removed her from Mother.

II.  **Disposition**

"The dispositional hearing took place on August 31, 2018. In the meantime, the Agency reported on the progress of the case. Mother was working with a different social worker on her assessment and case plan, she

3

was respectful, and she expressed remorse about her behavior toward the first social worker. Mother had experienced neglect, physical abuse, and sexual abuse in her life, and she showed insight into her own history of trauma. She had been evicted from her housing because of violent behavior toward staff, and she was now homeless[ ] and either stayed at shelters or slept on the streets. [¶]. . . . [¶]

"Mother began to receive three hours of therapeutic visitation with Minor per week in August 2018, after the Agency met with her to set expectations, including that the visits were only for Mother and Minor. Nevertheless, Mother brought her 16-year-old sister to the first therapeutic visitation session, which was delayed while the social worker persuaded them that the sister could not attend.

"Minor's foster parents reported that she had nightmares, was aggressive to animals, and had been violent toward the foster parents, who were not sure they could continue caring for her. Minor was having a difficult time after the visits.

"At the disposition hearing on August 31, 2018, the juvenile court continued Minor in foster care, ordered reunification services for Mother, and continued the matter for a six-month review on February 28, 2019.

### III. Request to Suspend Visitation and First Incarceration

"The Agency filed a request to suspend visitation on October 1, 2018. The request followed a September 26, 2018, incident in which Mother punched a social worker in the face, apparently thinking she was Minor's foster mother; followed Minor's therapist and an associate down the street and yelled that they had kidnapped her child; apparently vandalized the therapist's car; and shoved another Agency employee. The court issued a

4

restraining order protecting the social worker from Mother.  The court suspended visitation pending a hearing on the Agency's request.

"On November 2, 2018, Mother physically and verbally assaulted another social worker, apparently believing her to be a social worker who had worked on the case earlier in the year.  The trial court issued a restraining order protecting both social workers from Mother.

"Mother was arrested twice during the six-month review period, and was incarcerated in San Francisco, San Mateo, and Alameda County for a total of approximately four weeks.  On December 12, 2018, the juvenile court denied the Agency's request to suspend Mother's visitation and allowed her to have supervised visitation once a week while incarcerated in a county jail if she was in a program that allowed contact visits with Minor.  The order provided she would have supervised visitation once a week upon her release from custody, which occurred December 21, 2018.

## IV.   Six-Month and Twelve-Month Hearing

"Before the six-month hearing scheduled for February 28, 2019, the Agency recommended that the court terminate reunification services.  The matter was set for a contested hearing.  It was eventually continued again and took place concurrently with the 12-month hearing on July 24, 2019.  At the hearing, the Agency recommended that reunification services be terminated and the matter set for a [section 366.26] hearing.

### A.   Services Before Mother's Second Incarceration

"In February 2019, the Agency reported that Mother lacked housing. [ ] Mother had not followed up on any of the referrals or information [provided by the Agency].

"Mother had received referrals for individual therapy and medication evaluation in May, June, September, and December 2018.  [ ] She appeared

5

paranoid and anxious, but refused therapy and medication. Her use of narcotics was increasing.

"Mother had received a referral for anger management. [ ] [The Agency] gave Mother a referral to the female-only program, but she did not attend. [ ] Mother visited [a mental health] clinic once, but she did not go to her next appointment. [ ]

"Mother was visiting with Minor. The visits generally went well, although Mother sometimes had to be 'redirected' when she blamed other people for the fact that she and Minor could not live together, asked Minor if anyone was hurting her, or said negative things about men.

"The Agency described Mother's parenting skills as 'marginal at best.' She did not set boundaries for Minor, she had difficulty understanding Minor's developmental stages, and her fear for Minor's safety caused Minor anxiety. Minor was frightened when Mother constantly asked if she was being hurt or touched inappropriately or when Mother spoke negatively about men and cried. The Agency reported that Mother and Minor were 'very bonded and connected,' but concluded Mother did not understand how her aggressive and violent behavior affected Minor.

### B. [ ] Mother's Second Incarceration

"Mother was arrested on March 15, 2019 in San Francisco County, and by April 8, 2019 was being held in San Mateo County on charges unrelated to the dependency. She was still incarcerated at the time of the July 24, 2019 hearing. [¶]. . . . [¶]

### C. The 12-Month Review Hearing and Ruling

"The program manager and a social worker who also worked on the case testified at the 12-month review hearing. At several points during the hearing, Mother disrupted with profanity, crying, or vulgar gestures.

6

"The juvenile court found Mother had received reasonable services and had made minimal efforts to alleviate the causes of the dependency, terminated reunification services, and set the matter for a [section 366.26] hearing." [We end our quotation from *E.J. I* here.] The court granted Mother one visit with Minor a month.

Mother petitioned for extraordinary relief from the order, and we denied her petition on the merits on October 22, 2019.

## V. Events After Termination of Reunification Services

A report prepared for the section 366.26 hearing, initially scheduled for November 20, 2019, recommended that parental rights be terminated and Minor placed for adoption. After being continued several times, the section 366.26 hearing took place in December 2020.

### A. Visitation

Visits between Mother and Minor were consistent while Mother was in a local jail during her second incarceration, as the Agency would transport Minor to visit Mother in jail. Mother was transferred in October 2019 from county jail to Chowchilla State Prison, where she stayed until mid-December of 2019, and there were no visits during that time. The social worker assigned to the case, Leticia Ferretti, testified at the section 366.26 hearing that she did not know how to set up visits at the prison and her superiors told her to arrange visits with Minor's grandmother (Grandmother) instead.

Mother was released in December 2019, and the Agency immediately arranged for visits to take place at the parole program Mother was attending. They had an initial visit on December 18, 2019. However, Mother left the parole program in January and did not let the Agency know her whereabouts. She did not contact the Agency to confirm that she would attend the regularly scheduled visit on the third Wednesday of the month, so the Agency cancelled

7

the January 2020 visit. Mother called on the day of the visit, but Ferretti explained the visit had been cancelled because Mother had not confirmed her attendance and the Agency did not want to transport Minor to the visitation room only to have Mother fail to appear. Ferretti told Mother she had to confirm her visit a day in advance or the visit would be cancelled. Mother appeared for the February visit, which went well.

The day before the scheduled March 2020 visit, Mother spoke with an Agency employee; during the conversation, she was verbally aggressive and threatened the employee but confirmed she would attend the visit. Minor was transported to the visit location, but Mother did not show up. Shortly afterward, the COVID-19 shelter-in-place order went into effect, and visits could no longer take place in person.

Mother did not contact the Agency before the scheduled April 2020 visit, and a social worker left Mother a message asking her to call and set up a visit or phone call. Mother called back three days later, and when she and the social worker spoke, they agreed they would arrange a phone call or virtual visit on the regularly scheduled visit date on May 20, 2020.

A telephone visit took place in May 2020. The decision to have a telephone visit rather than a virtual visit was made in consultation with Minor's therapists because Minor had expressed worries about having visits and they thought it would be better to reintroduce consistent contact with Mother by telephone. The therapist reported that Minor said on April 20, 2020 that she did not want to visit with Mother, and during the May visit, Minor told Ferretti she did not want to visit with Mother or Grandmother "because of the past and they are not in her life anymore."

The June visit did not take place because Mother was briefly incarcerated. A virtual visit took place in July, but Mother had technical

8

difficulties, and the social worker tried to help her with them. Minor waited patiently for 20 minutes before saying she did not want to be on the call, and after trying unsuccessfully to encourage her to continue the visit, the social worker ended the visit.

Mother did not visit with Minor at all after the brief July 2020 visit. Mother had told the Agency she did not want to provide a telephone number and she asked the Agency to send her information only by email, and the Agency sent emails with the information to join the July, August, September, October, and November 2020 virtual visits.

On August 17, 2020, Ferretti received an email from Mother's counsel asking her to set up video visitation, providing a new telephone number for Mother, and giving a number at which Grandmother could be reached if Ferretti could not contact Mother. Ferretti sent the information to another Agency employee, who would set up the meeting. Ferretti testified that she believed the other employee tried all the numbers the Agency had for Mother. The Agency was never told the email address at which Mother had asked to be contacted was no longer valid.

Mother called the Agency on Wednesday, August 19, the regularly scheduled visit day, but the visit had been cancelled because Mother had not confirmed it in advance, and Minor refused to get on a Zoom call to visit with Mother. Mother did not contact Ferretti after that call, although she had called Ferretti's direct line in the past. The Agency sent emails to Mother each month from August to November, but Mother did not respond to any of them. Ferretti did not call Mother's number, and she did not contact Grandmother specifically to talk about setting up visits. She testified that Mother had been "very proactive" in the past about calling Ferretti when she missed a visit.

## B.    Minor's Situation and Wishes

Since March 2019, Minor had been placed with new foster parents, who wished to adopt her.  Her behavior had improved greatly and she was happy and emotionally stable in the foster home.

The Agency reported in November 2019 that Minor said she wished to be adopted, she called the foster parents her "moms," and she wanted to change her last name to theirs.  Minor loved and showed affection for Mother and she enjoyed visits with her, but the foster parents reported that after visits with Mother, Minor "comes back worried that her mother will come for her and hurt her as she did in the past."  But, according to the report, Minor and Mother had a very close bond and, although she sometimes expressed hesitation about seeing Mother, during visits she was "full on engaged and enjoying the visits with her mother."

In May 2020 the Agency filed a request asking the court to change its prior order allowing in-person visits once a month because the job of one of the foster parents required the family to move to another state.  (§ 388.)  The Agency asked that visits take place remotely until there was no health risk to Minor traveling.  The juvenile court granted the request, finding it was in Minor's best interest to move with the foster parents, and ordered that visits between Minor and Mother take place in person once the COVID-19 shelter-in-place order was lifted.  Mother appealed this order, and we affirmed it in *E.J. II.*

In December 2020, the Agency reported that Minor, then six years old, was adjusting well to her new home on the East Coast.  Minor had a strong and positive relationship with both her foster parents, referred to their family as her own, and said she was happy to have her new cousins so close to her.

Minor had told Ferretti she wanted nothing to do with her biological family members and she wanted to see only her new family. She told Ferretti in August 2020 she wanted nothing to do with Mother or Grandmother "because in the past they hurt me," and she had asked a number of times "if this can be over." Ferretti told Minor that the Agency would continue to try to have visits because there might come a time that she wished to see Mother; she also told Minor that Mother loved her and was making efforts to be different.

Minor's counsel reported that Minor had also told her she did not want to have contact with Mother or other biological family members. Minor said she wanted to live with her foster family and have them be her "forever family," they spent time with her, they were a happy family, she wanted to be adopted, and she did not know "why it seem[ed] to be taking so long."

## C. Mother's Evidence and Rebuttal

Mother testified at the section 366.26 hearing that her phone was stolen in July 2020, and as a result she did not have anyone's telephone numbers and was not able to log into her former email account. She set up a new email address in late August or September 2020, and had left multiple messages on Ferretti's voicemail and Ferretti's supervisor's email between late August and October with her new email address and her phone number in an effort to get the information she needed to participate in the scheduled visits, but she received no response. Mother denied that she told the Agency she wished to be contacted by email rather than by cell phone, and said she had provided her cell phone number. She also said she had called the day before the scheduled August 2020 visit to confirm her attendance.

Dr. Caroline Salvador-Moses, a licensed clinical psychologist, testified on behalf of Mother as an expert in conducting bonding studies and

11

psychological studies, in child and adolescent development, and in psychology. She had completed a bonding study of Mother and Minor in February 2020, after having observed visits between them in jail in September and October 2019, and opined that they shared a positive, secure bond and attachment to each other and that terminating the bond would be detrimental to Minor's psychological health. She recalled that they were happy to see each other, they would jump into each other's arms and hug and kiss, they showed love and joy during the visits, and they were both disappointed when the visits ended. Dr. Salvador-Moses noted that visits had been virtual for some time, and indicated the lack of physical contact could have influenced Minor's expressed views that she did not want to have contact with Mother and that she wished to be adopted. She also questioned whether Minor understood the consequences of adoption on her future contact with Mother.

Recalled to the witness stand, Ferretti testified that she checked her office voicemail regularly and she did not receive a call from Mother in September, October, or November 2020. Her supervisor, Aisha Lusk, would have contacted Ferretti immediately if someone involved in the case had contacted Lusk in an attempt to reach Ferretti. Lusk testified that she checked her office voicemail regularly and that she also received no calls from Mother in September, October, or November of 2020.

### D.    The Juvenile Court's Ruling

The juvenile court found by clear and convincing evidence that Minor was likely to be adopted. It concluded there was no compelling reason to determine that termination of parental rights would be detrimental to Minor: Mother's visitation did not demonstrate a bond that suggested continued contact would be beneficial to Minor, and Mother had not abided by the "one

rule to follow in order to have her monthly visit, and that was to confirm the visit the day before the scheduled visitation, which was established on the same day of every month so that visitation would be available even if [Mother's] whereabouts were unknown." The court found the beneficial relationship exception to the termination of parental rights did not exist, and accordingly terminated Mother's parental rights with a permanent plan of adoption for Minor. This timely appeal ensued.

## DISCUSSION

### I. Due Process

Mother contends she was deprived of due process that would have allowed her to establish the beneficial relationship exception to termination of parental rights.

It is well established that the guarantee of due process applies to dependency proceedings. (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 222.) In deciding what process is due, courts focus on three factors: the private interests at stake, the government's interest, and the risk the procedures will lead to an erroneous decision. (*Id.* at pp. 222–223.) The private interests at stake in a dependency proceeding—the parent's interest in the care and custody of his or her children, and the children's interests both in belonging to their natural family and in living free from abuse and neglect in a stable placement—are "enormous." (*Id.* at p. 223) The risk of erroneously terminating parental rights is lessened by the juvenile court's findings before setting a permanency hearing under section 366.26 and by the parent's opportunity to be heard on the question of reunification before that hearing. (*Dakota H.*, at p. 223.) As explained in *In re Hunter S.* (2006) 142 Cal.App.4th 1497, 1504, "the statutory procedures used for termination of parental rights satisfy due process requirements only because of the

13

demanding requirements and multiple safeguards built into the dependency scheme at the early stages of the process."

When the juvenile court terminates reunification services and orders a hearing under section 366.26 to determine a permanent plan for a dependent child, the court must continue to permit the parent to visit the child unless it finds visitation would be detrimental to the child.  (§ 366.21, subd. (h).)  However, at that point, after reunification services have failed, family reunification is no longer the primary goal; rather, the focus shifts to the child's interest in permanency and stability.  (*In re Dakota H.*, *supra*, 132 Cal.App.4th at p. 223.)

At the section 366.26 hearing, the preferred plan is termination of parental rights and an order that the child be placed for adoption.  (§ 366.26, subd. (b)(1).)  This preference may be overcome only in limited circumstances including, as pertinent here, when "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" due to circumstances including that "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  (§ 366.26, subd. (c)(1)(B)(i).)  To establish this exception, the parent has the burden to show, by the preponderance of the evidence, three things:  (1) "regular visitation and contact with the child, taking into account the extent of visitation permitted"; (2) a "substantial, positive, emotional attachment to the parent"; and (3) "that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home."  (*In re Caden C.* (2021) 11 Cal.5th 614, 636–637.)

The court in *Hunter S.* explained that "[m]eaningful visitation is pivotal to the parent-child relationship, even after reunification services are

terminated," and that if a parent is denied the safeguards of the statutory procedures "through no fault of her own, her due process rights are compromised." (*In re Hunter S.*, *supra*, 142 Cal.App.4th at p. 1504; accord, *In re Valerie A.* (2007) 152 Cal.App.4th 987, 1007 ["the erroneous denial of parent-child visitation compromises a parent's due process rights to litigate and establish the [beneficial relationship] exception"].)

A due process violation was found in *Hunter S.* The juvenile court there ordered visitation between a child and his mother, but the child refused to visit her, despite efforts by the child welfare agency, his relatives, and his therapist to get him to do so. (*In re Hunter S.*, *supra*, 142 Cal.App.4th at pp. 1501–1502.) The court refused the mother's requests to visit or talk with her son, and the court indicated it would not force him to visit with the mother. (*Id*. at pp. 1502–1503.) Reunification services were terminated and a section 366.26 hearing was set, and the mother filed a section 388 petition seeking reinstatement of reunification services. (*Id*. at pp. 1501, 1503.) The juvenile court denied the petition and terminated her parental rights. (*Id*. at pp. 1503–1504.) On appeal, the court concluded the juvenile court's failure to enforce the visitation order, on the ground the child did not want contact with the mother, was error. In doing so, it noted that the juvenile court may not "delegate to the child's therapist, DCFS or any third person, unlimited discretion to determine whether visitation is to occur" and that a child may not control whether any visitation occurs, and it concluded the juvenile court "impermissibly abdicated its duty [to ensure visits took place], delegating to Hunter's therapist and to Hunter the power to decide whether, when and how the case would 'move forward' with visitation.' " (*Id*. at p. 1505; see *In re S.H.* (2003) 111 Cal.App.4th 310, 317–318 [child's aversion to visiting abusive parent may be considered in administering visitation but may not be the sole

15

factor]; *In re Brittany C.* (2011) 191 Cal.App.4th 1343, 1358 [child may be allowed to refuse to attend particular visit but there must be assurance another visit will be scheduled and take place]; cf. *In re Sofia M.* (2018) 24 Cal.App.5th 1038, 1046 [when child refuses visitation, parent has burden to request specific type of enforcement or specific change to visitation order].)

This case is unlike *Hunter S.* or the other cases upon which Mother relies. The record here shows neither that Mother was denied visitation nor that the decision on whether any visitation would occur was delegated to Minor. Visits took place regularly as long as Mother was in a local jail. Mother points out the visits were interrupted for two months when she was sent to Chowchilla State Prison. (See *In re Precious J.* (1996) 42 Cal.App.4th 1463, 1476–1477 [where a parent is incarcerated "at a not 'excessively distant' " location, reasonable services may include visitation]; accord, *In re Brittany S.* (1993) 17 Cal.App.4th 1399, 1407.) But Mother makes no effort to show that Chowchilla is close enough to make visitation feasible and, in any case, that interruption in visits was brief. Within days of her release in December 2019, the Department arranged for a visit to take place. The visits were scheduled for the same day each month—the third Wednesday—and Mother was given until 4:00 the day before the visit to confirm her attendance in order to avoid transporting Minor in vain.

Most of the subsequent missed visits were attributable to Mother's failure to confirm her attendance in advance, or to appear for the visit even after confirming. Mother points out that in May 2020, she was offered only a telephone visit rather than a virtual visit, but the record shows the purpose of this arrangement was not to prevent visitation but to ease Minor back into consistent contact with Mother after Minor expressed hesitancy. With the exception of the June visit that was missed because Mother was again

16

incarcerated, there is no indication she would not have had access to virtual visits had she contacted the Agency before the regularly scheduled date and appeared for the visits.

Mother argues her right to visits was illusory because by July 2020 she had lost the telephone and her access to her email address and the Agency continued to contact her by email rather than phone. But there is evidence that she had told the Agency she wished to be contacted by email rather than phone, that the Agency was never told her email account was not working, and that the Agency tried to reach her on the numbers her counsel provided. There is also evidence that she called a social worker at the Agency on August 19, 2020, *after* the date she testified she lost her phone, indicating she was still able to contact the Agency. And, although Mother testified she made continuing efforts to contact the Agency after August 2020, the juvenile court was not obliged to accept her testimony in light of the rebuttal evidence that the Agency received no phone messages or email from her during that time.

Mother also argues Minor was improperly allowed to decide whether visits would take place. The record does not support this contention. Although Minor had said she no longer wished to visit with Mother, the evidence does not show her wishes were dispositive; rather, Ferretti testified she told Minor she would continue to arrange visits, that Minor might change her mind and want to talk with Mother, and that Mother loved her and was trying to change. This does not indicate the Agency gave Minor veto power over visits, but rather that it was seeking to persuade her to participate willingly if Mother confirmed her attendance in advance. As noted in *In re Brittany C., supra,* 191 Cal.App.4th at p. 1358, a child may be allowed to refuse to attend a particular visit without violating the rule against the child

17

dictating whether visits occur, as long as there is some assurance future visits will be scheduled and take place. That standard is met here.

Mother seeks to analogize this case to *In re David D.* (1994) 28 Cal.App.4th 941, but that case does not assist her. The mother there voluntarily placed her children in foster care while she escaped an abusive environment; after she attempted suicide, the juvenile court suspended all visitation because, on advice of counsel, the mother declined to deliver her hospital records to the court. (*Id.* at pp. 945–946, 951–952.) Reunification services were thereafter terminated, with the mother to receive only a single supervised visit, and the matter set for a section 366.26 hearing, at which her parental rights were terminated. (*Id.* at pp. 949, 951.) The appellate court concluded that suspension of visitation was inappropriate, as the mother's attempted suicide did not involve violence toward the children or take place in their presence (*id.* at p. 953) and that by restricting visitation to a final two-hour meeting, the juvenile court improperly "ensured the 'regular visitation' necessary to satisfy the [beneficial relationship] exception could not be satisfied" (*id.* at p. 955). The court therefore reversed the order terminating parental rights and ordered an additional six months of reunification services to give the mother the opportunity to reestablish regular visitation with the children. (*Id.* at p. 956.) Here, in contrast, there was no court order restricting Mother's visits with her children, the Agency arranged visitation on a regular schedule, and the evidence indicates that the lack of visits during 2020 was due primarily to Mother's own inaction in failing to contact the Agency or attend visits.

Mother's reliance on *In re S.S.* (2020) 55 Cal.App.5th 355, is likewise misplaced. The father there, who was not living with his 18-month-old child before the dependency began, was unable to visit with the child in person

because of the distance between the foster placement and his home, and the social services agency arranged an online video visit. (*Id*. at pp. 359, 361–362.) He was also unable to take custody of the child at the outset of the dependency because he lacked adequate housing, but the agency did nothing to help him obtain a stable residence. (*Id*. at p. 376.) The appellate court concluded the father was not given an adequate opportunity to reunite with the child before his parental rights were terminated; although he visited with her in person only six times, the record showed he missed visits because the distance and his work schedule made visitation difficult, and the agency did not assist his efforts to supplement the in-person visits with video meetings. (*Id*. at p. 377.) The court noted in an aside, "We can all appreciate now, in the midst of the COVID-19 quarantine, that video meetings are not an adequate substitute for meeting in person, even for adults. That's even more true for children, especially small children, who aren't cognitively developed enough to engage in that setting." (*Ibid*.) Mother argues that her poverty and homelessness similarly hampered her efforts to maintain contact with the Agency through email, but the record shows both that she asked the social worker to contact her through email and that she was able to call the Agency even after she testified she lost access to her email.

Mother also argues that video visits were a poor substitute for in-person visitation. But Minor is significantly older than the child in *In re S.S.*, and that case does not hold that video visitation during the unprecedented conditions of the COVID-19 pandemic and resulting shelter-in-place orders is inadequate to protect a parent's due process rights. In any case, the beneficial relationship exception applies only if the parent has maintained regulation visitation and contact with the child (§ 366.26, subd. (c)(1)(B)(i); *In re Caden C.*, *supra*, 11 Cal.5th at p. 636), and the evidence shows that Mother

19

failed to avail herself of the visitation that *was* permitted after the shelter-in-place orders went into effect.

In the circumstances, we reject Mother's contention that she was deprived of her right to establish the beneficial relationship exception to termination of parental rights.

## II. Request for Continuance

Before the section 366.26 hearing, Mother's counsel cited *In re Hunter S.* and *In re S.S.* to argue Mother was denied visitation in violation of her due process rights and requested a continuance to allow for remediation of the relationship between Mother and Minor. The juvenile court denied the motion. In her closing argument, Mother's counsel again asked the court to delay termination of parental rights until Mother had further visitation to allow her to rehabilitate her relationship with Minor.

When a juvenile court terminates reunification services and sets a hearing pursuant to section 366.26, the hearing should take place within 120 days. (§ 366.22, subd. (a)(3).) The section 366.26 hearing here was delayed for more than a year past that time. Section 352 authorizes a juvenile court to continue a hearing as long as the continuance is not contrary to the best interest of the child. (§ 352, subd. (a)(1).) We review denial of a request for a continuance for abuse of discretion. (*In re Elijah V.* (2005) 127 Cal.App.4th 576, 585.)

The juvenile court did not abuse its discretion in denying a continuance. We have already rejected Mother's contention that she was denied visitation in a manner that compromised her due process rights. Mother was not, like the parent in *In re Hunter S.*, *supra*, 142 Cal.App.4th at pp. 1506–1508, deprived of visitation; rather, the record supports the juvenile court's finding that she failed to avail herself of the visitation available to

20

her.  In the face of the already lengthy delay in the hearing, Minor's clearly expressed wish to be adopted by her foster family, and the lack of a due process violation, the juvenile court acted reasonably in declining to extend this matter further.

## DISPOSITION

The orders denying a continuance and terminating Mother's parental rights are affirmed.


TUCHER, J.

WE CONCUR:

STREETER, Acting P. J.
BROWN, J.

*In re E.J.* (A161744)

21